Good morning, Justices. May it please the Court, Dennis Wagner appearing on behalf of the appellant, Brian Campbell. If I could, could I reserve a couple of minutes for liberal? Sure. Keep track of your time, though, please. Okay. I think this isn't the typical qualified immunity case. We all know you get tons of these cases, and we're happy to be here. We think that this is a significant case, though. And the issue is, is it unreasonable for a law enforcement officer to be called to a location and to look at a court order and enforce it? By what right does he affect a turnover of a child based on his construction of the decree? The simple language of the order itself. But what authorizes a police officer to affect a turnover? I guess the issue being that the order itself doesn't – it has a self-authenticating feature, doesn't it? A judge has issued this order and indicated that for these two parties, this is the schedule. The judge promulgates the schedule. What authorizes this police officer to enforce the schedule? It doesn't say go out, like a warrant for arrest, go out and pick up this child. And that's the problem for the typical law enforcement officer in the field. There's no guidance for him. There's no case that says he can't do this, he shouldn't do this. Not that I'm aware of. Didn't he testify that their policy is not to do it? I thought his testimony was that he has been out on similar calls and had not enforced an order in the past, but the foundational elements for the other particular calls didn't – not enough sufficient facts were brought forth to show whether or not, you know, there's some pattern or inconsistency with the manner in which he did his job this particular day. Let me ask you on the – there's sort of a conspiracy allegation on this. And let's assume that, for purpose of argument right here, that I agree with you on what you're arguing right here. But then you put – if someone were able to show that the officer was acting conspiratorially in terms of – that it wasn't really that, you know, that he wasn't, say, acting in good faith. He was just trying to, like, help out a friend or something affect, you know, custody in the way that the friend wanted it. Would that be a different situation where an officer would not – if there was evidence of that, would that go outside of qualified immunity? Because that's a little different than an officer going out and saying, okay, you're looking at it saying, okay, I think that you should have the child right now, and so, child, go over here with this parent and that sort of thing. But let's say there was evidence that he's a friend of one of the parties and the party's saying, you know, I'm just having so much trouble with my ex, you know, can you help me out getting this straightened out? Does that make a difference here? It could. What's the evidence here? Okay, that's what – well, I want you to tell me what is in the record of that. All right. If I were to use your first name, the way they argued their case at the court below, if you were to rule in my favor, well, there must have been a conspiracy between me and you because I used your first name. Okay. Just tell me what the evidence was, not arguing it. Just say what was the evidence. The evidence was that the child indicated in deposition that the officer called his father by the first name, that his father seemed comfortable around him, and he's typically not comfortable around police officers. After the fact, supposedly, either the father or his father's sister made a comment, we got her. That's the evidence. Was there any evidence that the sister and the officer knew each other ahead of time? No. In Campbell's declaration in his testimony, he didn't know anybody. He just showed up there that day. But based upon what I just gave the court, that was the evidentiary basis to say that there's a conspiracy claim. And if that's the basis of a conspiracy claim to go forward, well. He also apparently knew that they were going to Oceanside for their vacation. That was another thing the magistrate judge mentioned in it. That's true. And the officer had a conversation with the father and the sister outside the home before he contacted the mother. They told him during the conversation what was going to happen. So it seems to me that there is no evidence of a conspiracy. If that's evidence to deny qualified immunity in this case, then it seems to me you're never going to get a summary judgment on a conspiracy claim. In the future, that's weaker than weak. Well, what, I guess, what, from your perspective, what is it, if the officers get called and they get called on a domestic dispute or whatever, do they have to go out? Do they have to go out? Yes. I mean, I think the Ninth Circuit indicates that if a woman calls, if they ignore the call, then there's a potential problem that there's some type of gender issue. If they don't respond to a woman calling, they have to go. Why, where did this event take place exactly? The event took place at the home of the mother outside the home on the front. Located where? The Highland, California. The city of Highland? I believe it's the city of Highland. Why did the deputy sheriff get involved rather than the Highland Police Department? Contract city. The sheriff's department provides contract services for that location. A number of cities in San Bernardino County contract with the sheriff's department for. Okay. Then she gets on the phone and calls the police, but she gets the Highland Police Department, not the sheriff's office. Is that right? No, no, no. The watch commander that she spoke to was the sheriff's department. When she comes out with a phone, Campbell thinks she's going in to call her lawyer. She comes out with a phone and gives him the phone. It's the watch commander for the sheriff's department. Says in the brief it was the Highland Police. That's not correct? Highland Police is the sheriff's department. They don't have their own separate police department. I apologize if I created that error. Gotcha. Okay. One of the other issues is just the, I think it's the Zekereski case. I can't remember if it's the 8th Circuit or 10th Circuit, but boy, that's a case that's pretty close. Pretty close to what happened here. And I think if you look at how they treated the substantive due process claim, it doesn't shock the conscience really on the facts that we have here. And there's an adequate state law remedy as to the procedural due process claim. I think it's an important case. And for whatever reason, I just think it seemed to get short shrift, at least in consideration of the court below, as to how the sister circuit attacked these same arguments. Did you want to reserve? Yes, please. Thank you very much. Good morning. Good morning. May it please the court. George Romaine for plaintiff and appellee Elaine Bretain. The issue as framed by counsel is incorrect. The issue is not whether it's unreasonable for a police officer to look at a court order and to enforce it. The issue is whether it is unreasonable for a police officer who has been in similar circumstances before and has adopted a procedure, which is to do nothing and to let the parties resort to the State court, whatever tribunal they are in front of, to resolve the disputes, to decide on this particular occasion that he's going to deny my client, the appellee, that opportunity and act as the official. Well, if he had always done it before, you know, if he always looked at it and said, okay, child go here, child go there, are you saying then you have no case? No. What I'm saying is at first he never said that child go here, child go there. He says it is not for me to decide what construction to place on a custody's visitation order and you, the parties, need to decide. Did he actually say that, though? No. Or did he, my reading was that he said, I've handled other cases. This was the first time I decided to tell the child to go, but not, but he didn't say in the other cases I felt I couldn't. I'm kind of getting to, you know, I'm trying to just get a hold on what the actual evidence is, not the way you'd like me to see it or the way that appellant would like me to see it. You know, what was the evidence before the judge? And I didn't read the officer's statement about the five times he dealt with custody as to how you're arguing it. The officer's statement was clear that in the prior occasions when there has been protest and contradictions between the parents as to the interpretation of the custody order, he has not gotten into playing judge and arbitrator and interpreting that custody order and making the determination as to who prevails over whom. In this case, the magistrate judge saw and found correctly that this particular police officer, when he was confronted with, first spoke to Ms. Bertain outside her door, said, I've already read this order and have decided that paragraph 12 trumps paragraph 11. That was in violation of not only the department policy, and there was evidence of that, but his own awareness of that policy and how he himself has conducted himself. Violation of policy. I'm sorry, I missed that. I didn't see in the brief a specific policy of the sheriff's department on this issue. I believe that was alluded to with respect to evidence by deputy. I think his name is not Osby, but something close to that. The sheriff, mainly the sheriff who appeared the day before. OK. Let me let me turn your attention to something that seems to me has been left out and whether or not we ever get to the facts. I was struck. Frankly, I read the brief of the appellant that cited cases of two sister circuits, the 10th Circuit and the 8th Circuit, which indicates that that this is not a substantive due process claim. You're here in the 1983. This is an estate court case. Unless you can come within 1983, then the magistrate judge was obviously wrong. Now, we have two sister circuits who specifically say that this is not substantive due process. It doesn't raise itself to that issue and that it's not shocking to the conscience. The cases are very close to this case. In your responding brief, you didn't even bother to cite the cases or respond to them, nor have you yet. It struck me that if these cases are correct, that we should reverse automatically on the basis that there's no substantive due process claim. There may be a claim in state court for some violation. I don't dispute that. The question is whether you're in the correct court under 1983. So what do you do about the 8th Circuit and the 10th Circuit cases? We have law that says unless there's some reason to the contrary that we should do it, we never create conflicts with other circuits. So we're almost out. You're almost out of court unless you can demonstrate to us why we shouldn't follow the 8th Circuit and the 10th Circuit. Yes, Your Honor. First of all, to the extent that I didn't allude to those cases in any way, I apologize. If I would say this, I would ask the Court that it is Appelli's position that that discussion of those two cases by the magistrate judge, which wasn't simply giving lip service to those cases, if you look at the recommendations of the magistrate, but a thorough analysis of those cases clearly show that those cases, number one, probably, if rightly construed, agree that in the context of a parent-child relationship, there is a substantive due process right in a parent having companionship care, custody, and management of their child. See, but the thing you're overlooking is that the magistrate judge was clearly wrong. The magistrate judge was talking about custody cases where the government comes in and seizes the children because both parents are alleged to be incompetent to take care of a child. That's an entirely different area of the law. What we're dealing with now is visitation rights. And it's a different area of the law with different rules, and the magistrate judge never got to the basic issue. The magistrate judge was obviously wrong, citing the wrong line of cases. This line of cases has to do with visitation rights. Now, maybe you could respond to us in that. The ‑‑ if you ‑‑ if the Court read, this Court read the analysis of the magistrate judge. I read it carefully and I found it very wanting. Then I would refer the Court to the actual language of the order that we're dealing with here. The actual language of the order, and I would reference just by way of example, and I can ‑‑ I have a copy if the Court would like to look at it. I've got it in front of me and I've read it. Okay. Tell me when you have it, Your Honor, so I can point. Ready. Go. Ready? If you look at the Exhibit A to that document, it says the parties are to arrange visitation ‑‑ Paragraph you're reading, 12? No, no. I'm beginning at the very beginning of Exhibit A. At the what? The very beginning of Exhibit A to be custody for. I'm sorry. Okay. I thought you were moving to 12, which is the one we were referring to earlier. Oh, no. Go ahead. Okay. It says the visitation rights. The parties are to arrange a visitation on mutually agreed upon terms that are convenient for each other. In the event that they are unable to do so, the following shall ‑‑ schedule will apply. Mother shall have, quote, unquote, custody of Matthew for purposes of visitation for the following times. And it goes on. Now, that was significant to the lower court because the court, as you aptly know from your thorough analysis of the court's interpretation of the system cases, found that for purposes of determining whether there was a substantive due process violation, this order was, in fact, a custody order for purposes of defining the client ‑‑ the party's rights as to when my client could have her child. That's right. The husband had legal custody. Your client had visitation rights. And this was over those visitation rights. It had nothing to do with the social services coming in and grabbing the child and taking him away, which is the cases the magistrate judge relied upon. You've read, I'm sure, the Tenth Circuit and the Eighth Circuit cases, which are identical to the case we have here. They deal with the ‑‑ with visitation rights. As a matter of fact, they're stronger cases because in this case, the husband had legal custody, so he had a greater liberty interest than the mother did. So we have that situation. And they say there's no substantive due process issue here. That is, they're saying you shouldn't be here in 1983. You should be taking your case to the state court. But in both those cases, the courts said that under the facts of the case as presented to them, they decided that in the context of the visitation orders, those visitation orders did not, under those facts, give rise to substantive due process. Neither of the courts said declaratively that in all cases involving visitation orders, that depending on how ‑‑ what happens in those cases, a visitation order cannot ‑‑ Kagan. Well, I beg to disagree with you on that. Well, Your Honor, can I also finish my last point? And also critical in both cases, the courts found, that's the sister ‑‑ the sister court cases, that the giving up of the child was consensual. There was no consensual aspect in this case. In fact, the magistrate judge highlighted the fact that this was a forcible removal of a child from a parent who, during the last three weeks in the summer, had the right to custody of her child. Whether you call it visitation or custody is almost a red herring, because the bottom equivalent to the custody of her child, and to say, well, because the custody order at the very beginning talks about physical and legal custody to the father simply kind of ignores the very fact and heart of the order that with respect to the actual implementation of that, when it comes to my client's rights, she does have custody rights. All I'm saying to you is, I don't read those cases that way. You're trying to distinguish them on the facts. But the cases say, Any deprivation of Weiss's visitation rights was so insubstantial in duration and effect to rise to a Federal constitutional level. And the Court goes on to say, Section 1983 should not be viewed as a vehicle to resolve disputes involving visitational rights privileges. I mean, it's very — there's very strong evidence. I don't see how you can distinguish those cases. First of all, Your Honor, I would differ with the Court and would ask whether the Eighth Circuit, having this case in front of it, the same judges, would have found whether there was — would have concluded as they did in that case. First of all, it clearly cannot be said that when a mother has a right to specific times over a long period of time to take custody of her child that this is an insignificant visitation right, nor can it be said that it's an insignificant visitation right where in determining who's supposed to have custody for specific times during the   It's an insignificant visitation right. And clearly, those were not the facts before the Court in the sister cases. Let me ask you a follow-up on what Judge Callahan was asking earlier. What evidence is there of a conspiracy that this was — that this officer was acting outside of the normal scope of his duties? As the Court pointed out, there was evidence of a conspiracy even beyond what was articulated by the magistrate judge. Speaking to — going to the declaration of the son that was — that is, Matthew,  mainly Ms. Hansen, who is the sister of the father, told her that they had met with an officer. The officer isn't identified, but basically, based on this discussion with the officer, we're going to maybe be able to overcome the fact that the day before, they were unable to remove Matthew because actually it's Officer Daugherty had read the order and concluded that clearly the order gave my right, my client custody of Matthew on August 21. Matthew says we found — I heard my aunt say that we found an officer who will help us, basically. Exactly. Well, what does that prove? Well, these are all inferences when all the facts have to be taken together. And you have an officer who shows up, who knows where the parents are going for — or the male parent is going for vacation. You have an officer who — The cop called somebody by a first name. They addressed the two — they addressed Ms. Hansen and the male parent by the first name in a jovial, comfortable manner. And let's not forget something that we haven't brought up. There was evidence of, in front of the court, evidence tampering. And to the extent that Officer Campbell tried to refute that evidence, his whole testimony with respect to the fact that there wasn't a conspiracy was called into question. You're referring to the turning on and the off of the tape recorder. I'm talking about the expert testimony that we presented to the trial court on the issue, which is not refuted, and which the — which Officer Campbell and his attorney attempted to ask the court to do further discovery on. And the court says, well, I can't understand why you're asking us now to do further discovery on the issue when you had all this time. Right now the evidence is uncontroverted that there was evidence tampering, and that goes to the heart. And this Court is allowed to make the — to ask itself the question whether all these facts considered, the familiarity or apparent familiarity that Officer Campbell had with Matthew's father and Matthew's father's sister, the fact that he had gone and decided for the first time that he was going to depart from his own practices in treating a situation that he had come up before. The fact that Hansen told Matthew that they had found an officer who was going to — they had gotten their cop, I think that was the quotation, to help them take Matthew from my client. The fact that this individual officer knew — was intimately familiar with the details of the father's vacation. Your time is up. Thank you very much, Mr. Romain. Okay, we'll hear back from Mr. Wagner, who had a couple of minutes in rebuttal. Thank you very much. I looked really closely at pages 195 to 201. Those are exhibits S and T, which the magistrate judge relied upon for the evidence of the conspiracy. It's even worse than I represented. Do you recall if Officer Campbell called Mr. Hansen by his first name? Answer, I believe so. Question, he called him Bill? Answer, I believe so. I'm not quite sure, though. Was there anything else said between them that led you to believe they'd met on a prior occasion? It seemed like it was on a more relaxed basis, like they'd talked for a while. You mean the manner in which they spoke was — well, there was an objective question, too. The issue of the tape, it's a red herring. I can assure you that's a factual issue, but it's a factual issue that has nothing to do with this issue before the court. If, in fact, they want to argue there's tape tampering, you know, that's obviously something that happened after the fact, an issue that's not been fully developed, certainly at the court below, but certainly an issue that doesn't bear on the legal issues at least presented in this case, which are similar to the Zekreski case, if I said it correctly. If the court has any further questions, I'd be happy to respond to any further inquiries.
judges: Wallace, Silverman, Callahan